IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

```
_____x
                                :
UNITED STATES OF AMERICA,       :          Criminal Action
                                :
                Plaintiff,      :          No.  2:14-cr-112
                                :
v.                              :
                                :          Date:  February 18, 2015
ALVIS PORTER,                   :
                                :
                Defendant.      :
_____x
```

TRANSCRIPT OF SENTENCING HEARING HELD
BEFORE THE HONORABLE THOMAS E. JOHNSTON, JUDGE
UNITED STATES DISTRICT COURT
IN CHARLESTON, WEST VIRGINIA

APPEARANCES:

For the Government:          AUSA MEREDITH G. THOMAS
                            U.S. Attorney's Office
                            P.O. Box 1713
                            Charleston, WV  25326-1713

For the Defendant:           J. TIMOTHY DIPIERO, ESQ.
                            DiTrapano Barrett & DiPiero
                            604 Virginia Street East
                            Charleston, WV 25301

Probation Officer:           Jeffrey Gwinn

Court Reporter:              Ayme Cochran, RMR, CRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.

1    PROCEEDINGS had before The Honorable Thomas E. Johnston,

2  Judge, United States District Court, Southern District of West

3  Virginia, in Charleston, West Virginia, on February 18, 2015, at

4  9:57 a.m., as follows:

5    COURTROOM DEPUTY CLERK:  The matter before the Court is

6  the United States of America versus Alvis Porter, criminal action

7  number 2:14-cr-00112, scheduled for sentencing.

8    THE COURT:  Good morning.  Will counsel please note

9  their appearances?

10    MS. THOMAS:  Meredith Thomas on behalf of the United

11  States.

12    MR. DIPIERO:  Tim DePiero on behalf of Mr. Alvis

13  Porter, who is also present, Your Honor.

14    THE COURT:  Good morning.

15    Mr. Porter, will you please stand, and I will ask the deputy

16  clerk to administer an oath to you at this time.

17    COURTROOM DEPUTY CLERK:  Please raise your right hand.

18    **ALVIS PORTER, DEFENDANT, SWORN**

19    THE COURT:  You may be seated.

20    Mr. Porter, do you understand that you are now under oath

21  and you must tell the truth and, if you testify falsely, you may

22  face prosecution for perjury or for making a false statement?

23    THE DEFENDANT:  I do.

24    THE COURT:  Throughout the course of this hearing, if

25  there's anything that occurs that you don't understand, I want

you to feel free to speak up and seek clarification.

Also, if at any time you need to confer with your attorney, I'll be pleased to pause the proceedings to allow you to do so.

Do you understand all that?

THE DEFENDANT: Yes, sir.

THE COURT: All right. Mr. DiPiero, have you received and read and reviewed with your client a copy of the Presentence Report?

MR. DIPIERO: Yes, Your Honor.

THE COURT: And, Mr. Porter, have you received and read and reviewed with your counsel a copy of the Presentence Report?

THE DEFENDANT: Yes.

THE COURT: Has the government received and reviewed a copy of the Presentence Report?

MS. THOMAS: Yes, Your Honor.

THE COURT: All right. I note that there were some objections asserted. What -- do we still have live objections?

MS. THOMAS: I don't believe so, Your Honor.

MR. DIPIERO: I don't think so either, Your Honor. I don't think there's anything material. I think the one thing that we were concerned about was taken out. It was hearsay and I think it was a typo on -- I think Mr. Barnette's name was there instead of Mr. Porter's. I don't think there's anything that's remaining.

THE COURT: All right. So anything's outstanding, I

1    can overrule as moot.

2         I would note that the one thing that caught my eye was, in

3    the addendum, was Mr. DePiero's argument about who approached

4    who, Runion versus Porter.  Based on everything I know about

5    these cases, it seems to me that it would make more sense,

6    despite what Mr. Runion would say, it really makes no sense for

7    Mr. Porter to approach Mr. Runion about this and, based on

8    everything I've heard in these cases, much more likely that Mr.

9    Runion would have initiated this arrangement, and I've taken that

10   into consideration, for what it's worth, in this proceeding.

11        Is there any objection to that?

12             MS. THOMAS:  No, Your Honor.

13             MR. DIPIERO:  No, Your Honor

14             THE COURT:  All right.  Very well.  Then I will -- I

15   will overrule the objections as moot and I will adopt the

16   Presentence Report and addendum, as written.

17        I would note that I have received the defendant's sentencing

18   memorandum.  Also, attached to that were a number of letters,

19   which are already a part of the record, so I don't believe we

20   need to address that any further.

21        On July 10th, 2014, the defendant appeared before this Court

22   and entered a plea of guilty to a single-count information

23   charging him with willfully failing to collect and pay over taxes

24   in violation of 26 U. S. C. 7202.

25        I deferred a factual basis at the plea hearing, but I will

now find, based on the entirety of the record, that there is a sufficient factual basis for the plea and I will adjudge the defendant guilty of that crime at this time and accept the plea agreement that was previously filed.

I'm now ready to give my tentative findings as to the applicable guidelines. I find a Base Offense Level of 12, minus 2 for acceptance of responsibility, for a Total Offense Level of 10; a criminal history category of I, based on 0 points, yielding an imprisonment range of 6 to 12 months, although I note that that is in Zone B, which provides for certain alternatives to imprisonment; 1 to 3 years of supervised release; one to five years of probation; a fine range of $2,000.00 to $20,000.00; and a mandatory special assessment of $100.00.

My understanding is that not only the forfeiture, but also, the restitution has already been paid, as well as the special assessment; is that correct?

MS. THOMAS: That's my understanding, as well, Your Honor.

MR. DIPIERO: Yes, Your Honor.

THE COURT: All right. Very well. Any objections then to my tentative findings as to the guidelines?

MS. THOMAS: No, Your Honor.

MR. DIPIERO: No, Your Honor

THE COURT: All right. I believe that the -- the only victim in this case is the IRS; is that correct, Ms. Thomas?

1          MS. THOMAS:  Yes, Your Honor.

2          THE COURT:  All right.  And they are exempt, obviously,

3    from the victim rights and reporting notifications requirements.

4          MS. THOMAS:  Yes, Your Honor.

5          THE COURT:  All right.  Very well.

6       Mr. Porter, at this time, the Federal Rules of Criminal

7    Procedure give you the right to make any statement that you would

8    like to make, although you're not obligated to make any

9    statement.  However, if you do choose to make a statement, I

10   would ask that you stand to do so.

11         THE DEFENDANT:  Your Honor, I would like to accept full

12   responsibility for my crime and I've -- at the time, I thought

13   that I didn't have a lot of choice, but I did, and I made a

14   mistake, and I embarrassed my family, and my friends, and

15   destroyed my business, and I'd like to apologize to everybody,

16   the Court, and my family, friends, employees, and let you know

17   that it won't ever happen again.

18         THE COURT:  Thank you, sir.  You may be seated.

19      Mr. DiPiero?

20         MR. DIPIERO:  Your Honor, before I get into asking this

21   Court to find a variance, kind of the elephant in the room is

22   that we got no substantial assistance motion, and there's some

23   things that I need to discuss which are sensitive that I don't

24   think should be in open court that involve some things that

25   occurred and things that have been said, and I think it needs to

be addressed, Your Honor.  I was shocked, disappointed, and I've

got to explain to the Court why they have done it, and I think it

can't be done because it involves some ongoing stuff.  I don't

think it can be done in open court without maybe jeopardizing

some confidentiality here.

THE COURT:  Why don't you all approach the bench and

let's talk about this.

(At side-bar).

THE COURT:  All right.  A couple thoughts about this.

One is, this is the second time in the last week that I've had a

defendant here expecting a 5K that didn't get one.  I don't know

if that marks some sort of new policy in the U. S. Attorney's

Office or what, but it's not my call.

Secondly, to the extent that the information that you want

to offer me relates to substantial assistance, my view is that's

-- leaving aside what I just said, that's the government's call

and I consider that if there's a motion and, for the most part, I

don't, if there's not, because I think the government has

obviously concluded that whatever has happened does not justify a

5K.

Third, I have -- I'm asking myself, why do I need to learn

this, because I doubt that it's going to have any impact on the

ultimate sentence that I render.  I don't think you're going to

be unhappy with that.  So, my question is, at this point, why do

I need to hear this?

1          MR. DIPIERO:  I can take a hint, and I guess -- I did

2    some research on this and I'm not looking for what some courts

3    accept as a departure where there's a class of citizens that you

4    can come up with a constitutional argument why they have not

5    given it.  I'm asking -- but it is relevant, Your Honor, for

6    variances, and I don't know that I need to get into it now that

7    you have said that, but what I would like to tell you is this.

8          There's no doubt, and it's my belief it was recommended,

9    that this came from higher-ups, but he is in a class, but in a

10   different reflection of what that means, he's a former politician

11   from Logan and he's suspected of knowing some information, and

12   that's the only reason he is not getting this, but they think he

13   knows something on one individual, which was the only reason he

14   was -- literally, he came to them first, before they even

15   approached us, and gave him the first information hand-in-hand

16   with Mr. Runion.  He should -- and I think everybody else in this

17   case is going to get substantial assistance and the only reason

18   he's not is because they believe without giving me any reason

19   why, they've got a hunch, because he's friends with someone, been

20   friends since they were in junior high school, that he should

21   know something on, and he answered all their questions, they were

22   pleased, and the people at the front lines were pleased with him.

23         Because the higher-ups said no, we get no substantial

24   assistance, and the irony is -- I hope he gets it, and he may get

25   it, but he won't because of one reason.  They think he must know

something on someone that's completely unrelated to this.  He

provided them crucial information, not only crucial, early, but

ongoing information, Judge.  We were calling them every day

before he ever was -- before he ever signed an agreement, before

any of this, telling them about conversations with Mr. Runion.

And what really hurts me, what really frustrates me, is it

puts my credibility on the line because I tell clients like him

who have had a -- just simple, my experience is, if you're with

them, and you get there early, they're going to help you.  If you

don't, they won't, and we -- I got him -- he decided on his own,

he decided, approach it, and we get no substantial assistance.

It is very frustrating.  I could go on and on about what this is

about.

The over thing is, he has given them information about a

public official that's more serious than anything we've heard in

this case and it's worse than what's involved in Mingo County.

(Redacted portion above ordered under seal).

MS. THOMAS:  I would just note that this is still on

the record, at this point.  I mean --

THE COURT:  We're on the record.

MR. DIPIERO:  I would ask that that be stricken then,

that one phrase.

THE COURT:  Okay.

MR. DIPIERO:  Please.  Please.  He's got information

1    that could be very crucial.  Nothing has happened because they've

2    been busy with home invasions, and the water crisis, and Mr.

3    Blankenship, but it's going to be big, but anyway, I just -- I'm

4    very frustrated that he's the first one to contact them on his

5    own and he gets no motion and everybody else does, but in view of

6    what you said, I don't think we need to go in the back.

7              THE COURT:  Well, Ms. Thomas, I suppose, if nothing

8    else at this point, I'll call on you to articulate a reason that

9    is not constitutional for not filing a 5K.

10             MS. THOMAS:  It's in the hands of the government under

11   the sentencing guidelines to make a motion.

12             THE COURT:  That's not good enough.

13             MS. THOMAS:  I would --

14             THE COURT:  I've looked at the case law on this

15   recently and I -- I don't know if this is your case or not.  I

16   think it was maybe Ms. Coleman's, but I've looked at the --

17   looked at the case law.  The extent of my authority is to ask you

18   for a reason that is not unconstitutional for the failure to file

19   the motion.  Just because we can is not a good enough answer.

20             MS. THOMAS:  One of the concerns is completeness of

21   information, Your Honor, and the United States is in a position

22   to believe that the information that Mr. Porter has -- while he

23   has provided significant 115(a) information in this case which he

24   -- which clearly relates to Mr. Runion, he  -- the United States

25   does not believe that he has given all the information that he

knows about criminal activity.

At the same time, I would note to the Court that he got a substantial break on the front end. He got a very beneficial plea agreement coming in early, and I would put that before the Court, as well.

THE COURT: All right. That's a -- that's a -- that's a reason it's not unconstitutional, I can't inquire further, and I will only observe that -- I mean, this is familiar in this way. The notion that the defendant got a break on the front end, you know, this is -- this is stepping out of my role, I realize, but I've got two lawyers now who feel like they should have gotten a 5K, who didn't, and in both cases, the government has said, well, they got a break on the front end, and that's fine, if everybody understood that was the reason or that was playing into the reason for the break, but -- and if that was made clear here -- Mr. DiPiero is indicating that it wasn't -- then the problem that the government is going to run into is that when you have defense attorneys that have a reasonable expectation that a 5K is going to be forthcoming and it doesn't, that's going to not be helpful for the government in the future, for whatever that's worth.

I know I'm not the U. S. Attorney. I have to tell myself that all the time. But I just -- I worry about what will come of that in the future. But not my call. I've done all I can, Mr. DiPiero.

MR. DIPIERO: The only other thing I want to add, Your

Honor, is it's my understanding, even though it's not grounds for departure, it is relevant under 3553(a) for variances, extent of the cooperation, and so I -- in that light, I'm going to proffer -- I will say a few things, one of which is what is really -- I don't want to belabor this, but I want you to know, Your Honor, that we were almost daily reporting on conversations that Mr. Runion was having with my client to the -- before we ever had a deal as a part of the -- just a good faith belief that this would inure to his benefit, and he got a good deal, but, you know, that's not what was -- that's not what I expected was the end, that somehow, because he got a good deal, he was going to not get substantial assistance all along.

They were very happy -- I didn't learn until last Monday, and that was partly because I was not -- not clear that I was still going to be in the case, but I didn't learn until last Monday that they weren't going to provide this, and I -- I really believe, Judge, I don't want to get into it, but I think you can challenge. They don't have one incident, one factor, one project, one political thing that they have any evidence that he and this other guy did something criminal. That's just a belief, that he should know, and I don't think that's good enough.

I'm not going to beat this dead horse, but I think this is wrong what's happened here. I'm ready to go on, but I think you should know how extensive his cooperation, and it was from the beginning.

THE COURT:  I have enough information to know that he was in very early and he provided a lot of information about what was going on at Mt. Laurel, I understand that, but again, it's within the government's discretion to file a 5K motion and that's that.

MR. DIPIERO:  And I --

THE COURT:  And, in this case, it probably wouldn't make much difference anyway.

MR. DIPIERO:  Thank you, Judge.

THE COURT:  Thank you.

(Side-bar concludes).

THE COURT:  Mr. DiPiero, anything further?

MR. DIPIERO:  Yes, Your Honor.  I just want to advise the Court of a few things, some of which is in the Presentence Report and some which is not, but following some early conversations -- let me -- let me back up.

I want the Court to know that Mr. Porter quit on his own.  I think it was approximately September of '13, I believe.  I get confused on the dates, but quit making any payments and just decided he wasn't going to do it anymore.  So he quit on his own before he -- about four months before, about five months before he knew that there was an investigation going on.

He came to me after he learned, and we had some lengthy discussions, and he decided that I should approach the government and offer to be willing to tell the truth about what had

happened.  The government wasn't ready to talk to us.  They --
Ms. Thomas said, "No, I can't talk to you.  I can't talk to you
right now.  I'm not going to talk to you."  I'm not sure why was
their reason, but they did.

Eventually, I gave them a proffer, a very general one, and
then the day after -- this was long before I met Mr. Steve
Herndon and before I knew Mr. Roeher was involved.  On that
Sunday, they came in and, on the next day, on Monday, I gave them
all the details of what we knew, and then there were ongoing
conversations and he was -- he was providing information before
we ever had an arrangement.  I want the Court to know he took
positive steps in that direction.

I think the Presentence Report is quite remarkable for a
couple of reasons, one of which is this man came from a poor
family and he has worked since he was 13 years of age, and that's
all he has known, is hard work, and he gave you a lengthy,
honest, and compelling account of how he got involved in this
thing, at the time, believing that with owing $4.5 million, that
he personally guaranteed, and having a bunch of employees, he
didn't have any choice but to go along.  He has since come to
realize that that was a bad mistake, because he's not only lost
all of that business, and all of those employees, and had to pay
all of that money, but now he's lost reputation and faces
possible imprisonment and everything.

The other thing is quite -- quite favorable in his -- on his

1  side is, Judge, the letters that came forward, and I know that --

2  I know that anybody can get somebody to write a letter, I

3  suppose, but what I liked about these letters and what I thought

4  was unusual was that he gave so much money, use of his machinery,

5  and took care of individuals and he didn't ask for any fanfare

6  and some of was anonymous.  Now, that's kind of biblical.  That's

7  what he was supposed to give and that's what he did.  I mean, he

8  went out of his way to help, but he didn't try to make a big deal

9  out of it and I think that really speaks highly of him.

10      Through this, I've gotten to know him, and he's a quiet man,

11  and he's a very big family man, and I think that speaks highly,

12  too.

13      I want the Court to realize two things.  When the Court

14  sentenced Mr. Roeher it took into account the crime itself that

15  he pled to, not so much the underlying Mt. Laurel stuff, and my

16  buddy, Mr. Roeher, did engage in some false invoicing and made

17  money through false invoicing.  Mr. Herndon, who I also

18  represented, was on the inside and actually made money off the

19  deal.

20      But, in Mr. Porter's case, he never engaged in any false

21  billing and never hiked his prices to cover the payments he was

22  having to make, and I think that speaks well, because I've been

23  involved in a case where that happened significantly right before

24  this, a year before this, and that was one of the reasons why I

25  encouraged him that I really predicted that this thing was going

1    to -- this thing was going to -- they were going to -- this thing

2    was going to -- they were going to get to the bottom of it, just

3    like they did with Massey, the Massey cases.  I figured they were

4    Arch was -- this whole thing was going to collapse, as well, and

5    so, it certainly did, and partly because of his great

6    cooperation.  I've never seen an investigation kind of collapse

7    and get resolved so quickly as this one did.

8        So, both received probation in that case, in their cases,

9    and I just think it would be appropriate that he not get a

10    different one, and one of the considerations he's lost, you know,

11    he's lost his entire business.  I respectfully ask for probation.

12        I would mention, if you'll look at the Presentence Report,

13    which I'm sure you have, that he's had -- he's got significant

14    health issues.  He had a stroke in June of '12 and he had a bad

15    wreck with concussion, broken ribs, and broken tailbone in

16    January of 13.  He has been declared disabled.  I just think,

17    Your Honor, it would be somewhat -- well, unfair may be a bad

18    word -- but just not the best if he got a different sentence than

19    what has been given to these other two individuals.

20        I respectfully ask for a variance either on his substantial

21    cooperation and his health issues for two points to get him down

22    to where he would be at probation or, if not -- if not, then if

23    it remains at ten, then he would be given no prison time, but be

24    given home confinement for a short period.  Thank you very much.

25        THE COURT:  I've got a question for you, Mr. DiPiero.

1     MR DIPIERO:  Yes, sir.

2     THE COURT:  You said that Mr. Porter quit making the

3 payments to Mr. Runion in about September of 2013.  This all sort

4 of broke loose, as U recall, in about April or May of 2014.  Were

5 there any repercussions with his contract at Mt. Laurel for his

6 stopping the payments?

7    (Counsel confers with defendant).

8     MR. DIPIERO:  There were no repercussions, as I

9 understand it, Your Honor.  He had -- they had just moved him,

10 Mr. Runion, to another operation and it made it a little bit

11 easier, apparently, not to be seeing him all the time, but he was

12 still -- he was still in control of that place, but he was moved.

13 I think they were starting another operation and I think the

14 Court, if it doesn't already understand, Mr. Runion was making

15 Arch millions, and millions, and millions, and millions of

16 dollars, and they were very happy with the work he was doing.

17   And so, I just want to -- I want to say that I don't think

18 there was any direct repercussions.  He was in a little bit

19 better position because he paid much of his debt down, but he --

20 just to be open about it, but my way of thinking, there were no

21 repercussions, but he did quit on his own.

22     THE COURT:  All right.  Thank you.

23   Ms. Thomas, I've got a question for you, too, and then I

24 will hear from you.

25   Mr. Porter submitted a lengthy statement for acceptance of

responsibility in which a number of things were set forth and
explained and one of them was a -- he asserts that an audit was
initiated by a person who he identifies as the Chief Financial
Officer, Mr. Tim Leap, that ultimately led to Mr. Leap's
departure from Arch.  Does the government have any information
about that or have any way to confirm or contest that
information?

          MS. THOMAS:  It's my understanding that that actually
did happen, Your Honor.

          THE COURT:  So you don't contest that?

          MS. THOMAS:  No, Your Honor.

          THE COURT:  That's very interesting.

    All right.  Anything else on behalf of the government

          MS. THOMAS:  Briefly, Your Honor.  In regard to the
crime of conviction, I would ask that the Court consider a
deterrence to others as the sentencing guidelines instruct.

    Here, in regard to this crime, Mr. Porter knew he had to
comply with the law regarding employment taxes and he simply
chose not to.  He did come in early and he certainly got a
benefit for that.

    The Court should also be aware, as counsel pointed out, that
he did cooperate even before his plea agreement was signed and he
was the first large vendor who came in and was able to
essentially put cash in David Runion's hands.

    As to his other conduct, he did have a choice regarding

kickbacks.  When individuals pay to play, they're getting something out of it.  Here, Mr. Porter got lucrative jobs at Mt. Laurel in exchange for paying Mr. Runion cash.  He got to continue to work there and he got paid handsomely for it.

This kind of conduct impedes the free market.  It's a culture that hurts the coal community.  We don't get to hear from the vendors who didn't pay to play and Arch Coal doesn't get the benefit of a bargain where they know all of the relevant facts.  Clearly, this contract was worth at least the kickbacks that he paid to Mr. Runion.

THE COURT:  All right.  Thank you, Ms. Thomas.

All right.  After consideration of the advisory guidelines and the other applicable factors from 18 U. S. C. Section 3553(a), I am now ready to impose sentence.

Will the defendant please stand?

Mr. Porter, your case -- well, it's interesting on several levels.  First of all, these -- this round of cases come in on the heels of a similar set of cases coming from what was then Massey Energy, as well as, from my perspective, as well as some of the political corruption cases I see coming out of the same area, are all symptomatic of what I view as a culture of corruption in the southern coal fields and, you know, to that extent, you were a participant in that, but I think there is a little bit more to it in your case.

Looking at the kickback scheme as it relates to your case,

there is an argument to be made that you were a victim of that scheme, and I'll outline what I mean by that.

You had a contract at Mt. Laurel before Runion ever sought payment from you, and when you were asked to make these payments, it was to keep that contract, a contract that you already had. I have no evidence that you were doing anything other than fulfilling the obligations of that contract doing your work. Now, you were doing very well, as reflected in your balance sheet, but last I checked, that's not against the law in this country, and there's nothing wrong with making a profit, an honest profit, even if it's a good one, but when you were asked then to make these payments, you faced a significant dilemma.

You faced, on the one hand, making the payments for which, as I understand it, you didn't mark up the price, you simply ate it and paid it, and keep your business, and keep your business going, a lucrative business, I agree, but -- or face the very real threat of the collapse of your business. It was a stark choice, a serious dilemma and, if viewed from that perspective, looks an awful lot like a shakedown. So -- for which I can't -- other than keeping the contract that you had already before all of this, I can't see that you got anything out of it. I can't see that you -- there's nothing in the record that suggests that you did anything else that was dishonest. You weren't stealing from the company. You were just doing your job under the contract and, to me, that is a significant factor in this case.

You have no criminal history, you appear to be an otherwise solid member of the community, and I understand that you were in early and helpful in this investigation, and I understand -- I understand all of that.

I -- unfortunately, this case doesn't end there, because you did commit a tax crime to which you have admitted; although, in the universe of tax cases that I've seen, this one is relatively small in scope.

I don't see any need to -- for further deterrence from you or to protect the community from you. You have already paid significant monetary penalties and so, to the extent that a variance is necessary to get you to probation, I believe that that is warranted.

The sentence I'm going to render then, is essentially directed only at the crime of conviction to which you -- to which you pled.

Therefore, it is the judgment of this Court that you be sentenced to a term of three years of probation.

While on probation, you must not commit another federal, state or local crime; you must not possess a firearm or other dangerous weapon; and you must not unlawfully possess a controlled substance.

You must also comply with the standard terms and conditions of probation as recommended by the U. S. Sentencing Commission and as adopted by this Court, including the -- except that you

need not participate in a program of testing, counseling and
treatment for drug and alcohol abuse.

You must also abide by the special conditions of probation
as set forth in the local rules of this Court.

I'm going to go ahead -- I am going to impose a $2,000.00
fine, I'm going to make that due immediately, and I will make it
a special condition of probation that you pay that within the
next 15 days.

As I understand it, all of the other financial penalties and
restitution have been paid.

You may be seated.

Mr. Porter, I note that there is a significant appeal waiver
contained in your plea agreement. As qualified by that waiver,
you have the right to appeal the judgment of this Court. Any
Notice of Appeal must be filed with the Clerk not more than
14 days from the date of the entry of the judgment order.

If you desire counsel on appeal and you are unable to retain
counsel, the appropriate court will review a financial affidavit
filed by you to determine whether or not to appoint counsel.

Do you understand your right to appeal and the 14-day filing
requirement?

THE DEFENDANT: Yes, sir.

THE COURT: All right. I will place the Presentence
Report under seal subject to counsel's right to unseal, as
necessary, for appeal.

1          Any other matters we need to take up in this case?

2               MS. THOMAS:  No, Your Honor.

3               MR. DIPIERO:  No, Your Honor.  Thank you, sir.

4               THE COURT:  All right.  Thank you.

5          (Proceedings concluded at 10:33 a.m., February 18, 2015.)

6

7

8    CERTIFICATION:

9         I, Ayme A. Cochran, Official Court Reporter, certify that

10   the foregoing is a correct transcript from the record of

11   proceedings in the matter of United States of America, Plaintiff

12   v. Alvis Porter, Defendant, Criminal Action No. 2:14-cr-112, as

13   reported on February 18, 2015.

14

15   s/Ayme A. Cochran, RMR, CRR                February 25, 2015

16   Ayme A. Cochran, RMR, CRR                       DATE

17

18

19

20

21

22

23

24

25